UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| LIFESPAN PHYSICIANS PROFESSIONAL SERVICE ORGANIZATION and THE MIRIAM HOSPITAL, Plaintiffs | |
| v. | C.A. No. 05-239S |
| HEALTHCARE VALUE MANAGEMENT, INC. and IRON WORKERS DISTRICT COUNCIL OF NEW ENGLAND WELFARE FUND, Defendants | |

**PLAINTIFFS' OBJECTION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiffs, Lifespan Physicians Professional Service Organization ("PSO") and The Miriam Hospital ("TMH"), hereby object to Defendant, Iron Workers District Council of New England Welfare Fund's Motion to Dismiss for the reasons set forth in the attached Memorandum of Law in Support of Objection to Motion to Dismiss.

Respectfully submitted,

LIFESPAN PHYSICIANS PROFESSIONAL
SERVICE ORGANIZATION and
THE MIRIAM HOSPITAL
By its Attorney,

Linn F. Freedman (#4778)
Nixon Peabody LLP
One Citizens Plaza, Suite, 500
Providence, Rhode Island 02903
Telephone: (401) 454-1108
Fax: (866) 807-6614

September 2, 2005

P126468.1

CERTIFICATE OF SERVICE

I hereby certify that I mailed a copy of the within Objection to Motion to Dismiss by first-class mail, postage prepaid on this 2ND day of September, 2005 to the following:

Matthew T. Oliverio, Esq.
Oliverio & Marcaccio, LLP
55 Dorrance Street, Suite 400
Providence, RI 02903

Michael J. Lepizzera, Jr., Esq.
Lepizzera and Laprocina
301 Metro Center Blvd., #102
Warwick, RI 02886

Nereide Dooriss

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| LIFESPAN PHYSICIANS PROFESSIONAL SERVICE ORGANIZATION and THE MIRIAM HOSPITAL, Plaintiffs | |
| v. | C.A. No. 05-239S |
| HEALTHCARE VALUE MANAGEMENT, INC. and IRON WORKERS DISTRICT COUNCIL OF NEW ENGLAND WELFARE FUND, Defendants | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO MOTION TO DISMISS**

Plaintiff, Lifespan Physician's Professional Service Organization ("PSO") and The Miriam Hospital ("TMH") hereby request that this Court deny Defendant, Iron Workers District Council of New England Welfare Fund's ("Iron Workers") Motion to Dismiss in this matter.

**The Facts**[1]

Plaintiff, PSO is a professional services organization whose members provide healthcare services to patients and which negotiates contracts on behalf of hospitals with different entities for the provision of healthcare services. The PSO is organized under the laws of the State of Rhode Island with a principal place of business at 167 Point Street, Providence, Rhode Island. (Complaint ¶2).

[1] In passing on a Motion to Dismiss for lack of personal jurisdiction, the Court should accept Plaintiffs' well-pleaded and properly documented evidentiary proffers as true. Daynard v. Ness, Motley, Loadholt, Richardson and Poole, P.A., 290 F.3d 42, 50 (1st Cir. 2002).

Plaintiff, TMH is a healthcare provider organized under the laws of the State of Rhode Island with a principal place of business at 164 Summit Avenue, Providence, Rhode Island. (Complaint ¶3). TMH provides emergency and routine medical attention to patients from New England, including Rhode Island, Massachusetts and Connecticut.

Plaintiff, PSO, on behalf of TMH entered into a contract with HCVM and HCVM members, including Iron Workers, on or about June 1, 1998, the terms of which included that TMH would provide medical services to patients, including John Doe in exchange for the Iron Workers paying for the services. (Complaint ¶24) (Exhibit "A," Contract).

Judy Randall of the PSO was responsible for negotiating the contract with Healthcare Value Management ("HCVM") on behalf of Lifespan affiliated hospitals, including The Miriam Hospital. (See Exhibit "B").

When she negotiated the contract with HCVM in 1998, HCVM provided PSO with a payor client list, which included Iron Workers. The payor client list indicated that decisions regarding eligibility of members was determined by the Iron Workers District Council of New England Fund office and that claims were determined by Ullico and utilization was determined by Ullicare. (Exhibit "B").

The Iron Workers has been a member of HCVM since the inception of the contract in 1998.

Between October 1, 1998 and September 30, 2000, Iron Workers members utilized services at both Rhode Island Hospital and The Miriam Hospital pursuant to the contract in effect between the PSO and HCVM. Specifically, from October 1, 1998 through September 30, 1999, there were 155 visits by Iron Workers members to Rhode Island Hospital for a total charge of $227,505. In addition, from October 1, 1998 through September 30, 2000, there were 37

visits by members of the Iron Workers Fund to The Miriam Hospital for a total of $156,623. (Exhibit "B").

On May 8, 2000, Ms. Randall forwarded an updated listing of HCVM clients to the Lifespan providers, including The Miriam Hospital, which included Iron Workers District Council of New England which listed the Fund office for eligibility, claims to Ullico and year end medical review to Ullicare. (Exhibit "B").

On July 25, 2000, when Ms. Randall was re-negotiating the contract with HCVM, it sent her a letter stating that the Lifespan hospitals "have been the prime hospitals in Rhode Island to which our clients[2] have attempted to direct their insureds for care. As a result, our utilization of both hospitals has continued to expand dramatically. In the past year we have had record growth at both hospitals . . . Miriam Hospital increased from $1.65 million to $2.3 million." (Exhibit "B").

An updated contract including client list and fee schedules was provided by HCVM to the PSO on August 28, 2000. HCVM indicated that participating providers in the network continued to grow rapidly and now "numbers almost 34,000 providers in all six New England states." In addition, HCVM stated that the client/payors administer claims for over 550,000 covered lives. Attached to the memorandum dated August 28, 2000 is a client/payor list which includes Iron Workers, as well as claims information which indicates that eligibility, claims and utilization were administered by Union Labor Life. Ms. Randall forwarded the memorandum to The Miriam Hospital on September 7, 2000. (Exhibit "B").

---

[2] Including Iron Workers.

On November 29, 2000 Ms. Randall received and forwarded an updated client/payor list from HCVM which listed Iron-Clad (Iron Workers D.C. of New England) as a member. She forwarded the updated list to Lifespan Hospitals, including The Miriam Hospital. (Exhibit "B").

From January 1, 2000 through December 31, 2000, the Iron Workers members visited The Miriam Hospital 31 times on an outpatient basis for a total of $27,880 and 58 times between January 1, 2001 and December 31, 2001 for a total charge of $88,749. (Exhibit "B").

On or about November 13, 2003, John Doe, a participant in the Iron Workers Fund, presented himself for emergency treatment at TMH. His treatment included certain medication and blood products necessary for his condition. (Complaint ¶¶12-13).

John Doe received medical services at TMH from November 13, 2003 through November 27, 2003. The costs associated with his medical care totaled $598,057.80. (See Exhibit "C"). The admission was approved by HCVM. (See Exhibit "B"). The bills were submitted to Iron Workers through its claims administrator, Iron Clad on December 12, 2003. Thereafter HCVM requested an itemized bill on January 19, 2004 which was provided by PSO on January 20, 2004. (See Exhibit "B"). The PSO thereafter contacted HCVM on February 23, 2004, March 5, 2004, March 12, 2004 and March 18, 2004. (See Exhibit "B"). Iron Clad, through its counsel, contacted PSO on several occasions regarding the claim. (See Exhibit "B"). The PSO responded to Iron Clad's letters and thereafter, Iron Clad, on behalf of Iron Workers, paid $236,513.20 toward the claim. (See Exhibit "B").

However, pursuant to the reimbursement contract in effect between PSO and HCVM, Iron Clad, on behalf of Iron Workers, was responsible to pay 79.88% of all charges for services rendered to John Doe, which Iron Clad has refused to pay. Accordingly, Defendants are

responsible for the balance of the claim totaling $240,571.73. Defendants have refused to pay the balance, necessitating this litigation.

## Argument

### A. The Standard of Review

The Plaintiffs have the burden to prove personal jurisdiction over the Defendant. In the First Circuit, Courts utilize the prima facie standard to determine whether or not the Court has jurisdiction over the Defendant. Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 675 (1st Cir. 1992). The District Court, in passing on a motion to dismiss for lack of personal jurisdiction, should accept Plaintiff's well-pleaded and properly documented evidentiary proffers as true. Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir. 2002) quoting Foster-Miller, Inc. v. Babcock and Wilcox Canada, 46 F.3d 138, 145 (1st Cir. 1995). When applying the prima facie standard, a "district court does not act as a fact finder; to the contrary, it ascertains only whether the facts duly proffered, freely credited, support the exercise of personal jurisdiction. Boit, supra; see also Rodriguez v. Fullerton Tires Corp., 115 F.3d 81, 84 (1st Cir. 1997).

To establish personal jurisdiction, a Plaintiff must show that: (1) the forum state has a long-arm statute that purports to grant jurisdiction over the Defendant and (2) exercising jurisdiction is within the due process requirements of the Fourteenth Amendment of the U.S. Constitution. Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995). Rhode Island's long-arm statute claims jurisdiction to the maximum extent permitted by the Fourteenth Amendment and therefore, the Court must determine whether or not asserting personal jurisdiction over the Defendant is consistent with the due process clause. See Almeida v. Radovsky, 506 A. 2d 1373, 1374 (R.I. 1986); Levinger v. Matthew Stuart & Co., Inc., 676 F. Supp. 437, 439 (D.R.I. 1988).

**B. This Court Has Specific Personal Jurisdiction Over the Defendant.**

There are two types of personal jurisdiction -- general and specific. In this matter, Plaintiffs claim the existence of specific jurisdiction only. In order to find that specific jurisdiction exists, the following factors are considered by the Court:

> First, the claim underlying the litigation must directly arise out of, or relate to, the Defendant's forum state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable. Sawtelle, supra, at 1389 (citing United Elec., Radio and Machine Workers of America v. 163 Pleasant St. Corp., 960 F.2d 1080, 1089 (1st Cir. 1992); Nowak v. Tak How Investments, Ltd., 94 F.3d 708, 712-13 (1st Cir. 1996).

In considering the formula outlined above, there are three prongs that must be considered by the Court. These prongs include the relatedness factor, the purposeful availment factor and the reasonableness factor, including examining the Gestalt factors. Plaintiffs in this matter have satisfied all three prongs of the tripartite test for the Court to exercise personal jurisdiction over the Defendant.

**1. Relatedness.**

The relatedness requirement focuses on the nexus between the Defendant's contacts and the Plaintiffs' cause of action. Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 206 (1st Cir. 1994). The relatedness requirement is satisfied if the "underlying litigation. . . directly arises out of or relates to, the Defendant's forum-state activities." Daynard, supra at 61.

It is clear from the facts presented in this matter that Plaintiffs have satisfied the relatedness prong of the tripartite analysis. Taking all facts pled by the Plaintiffs in the light most favorable to the Plaintiffs, it is clear that the dispute in this case "arises from" or "relates to" Iron Workers and/or Iron Workers' member's contact with the State of Rhode Island. John

Doe, who is a member of the Iron Workers, was admitted to TMH for emergency medical treatment. HCVM authorized the medical services provided to John Doe pursuant to its contract with Iron Workers. When the rendering of medical services to its member out of state was authorized, Iron Workers knew that it would have to pay for the services rendered out of state. When Iron Workers failed to pay for the services rendered to its member, Iron Workers caused the dispute. Iron Workers was well aware of the fact that its members would utilize TMH as its members had done so since 1998.

Iron Workers entered into a relationship with PSO and TMH when it contracted with HCVM to be a part of its network, which included hospitals all over New England. Further, it authorized TMH to provide services to its member in Rhode Island. In addition, the services were provided to the Iron Workers' member in Rhode Island. Iron Workers breached the agreement with the PSO and TMH in Rhode Island when it failed to pay for the services rendered. Finally, Iron Workers negotiated with the PSO in Rhode Island by contacting the PSO by telephone and sending correspondence to the PSO in Rhode Island. See Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985) ("it is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether Defendant purposefully established minimum contacts with the forum.")

The requirement of determining the nexus between a plaintiff's claim and the defendant's contacts with the forum is flexible and relaxed, but the action must directly arise out of the specific contact between the defendant and the forum state. Ticketmaster-NewYork, supra. In this case, the plaintiff has shown that as a direct result of Iron Workers' contacts with the PSO and TMH, the dispute arose.

Accordingly, based upon the foregoing, it is overwhelmingly clear that Plaintiffs have satisfied the relatedness prong of the analysis.

**2. Iron Workers Has Purposefully Injected Itself Into Rhode Island.**

The purposeful availment test focuses on the deliberateness of the Defendant's contacts with the forum state. Ticketmaster-New York, supra at 207. The requirement of purposeful availment necessitates a voluntary decision by the defendant to inject itself into the local economy as a market participant. Microfibres v. McDevitt-Askew, 20 F. Supp. 2d 316, 321 (D.R.I., 1998). "The cornerstones upon which the concept of purposeful availment rest are voluntariness and foreseeability." Sawtelle, supra at 1391; Ticketmaster-New York, supra at 207; Jackson v. Eximias Pharmaceutical Corp., 248 F. Supp. 2d 31(2003). In Jackson, the Court quoted Daynard, supra:

> Even in cases where the defendant was not physically present in the forum, where the defendant initiated the transaction by mailing or calling the plaintiff in the forum and when the defendant contemplated that the plaintiff would render services in the form . . . many courts have found jurisdiction. Jackson, supra at 36; Daynard, supra at 62.

The Court in Jackson noted that Courts in the First Circuit and other Circuits have recognized that internet-based contacts, including e-mail communications, coupled with other more traditional contacts, offer compelling grounds for the assertion of personal jurisdiction over a non-resident Defendant. The Court quoted Gorman v. AmeriTrade Holding Corp., 293 F.3d 506, 511(D.C. Cir. 2002) as follows:

> In the last century, for example, courts held that, depending upon the circumstances, transactions by mail and telephone could be the basis for personal jurisdiction notwithstanding the Defendant's lack of physical presence in the form. There is no logical reason why the same should not be true of transactions accomplished through the use of e-mail or interactive websites. Indeed, application of this precedent is quite natural since much communication over the Internet is still transmitted by ordinary telephone lines. Gorman, supra at 511; Jackson, supra at 37.

In applying the law to the facts of this case, it is clear that Plaintiffs have sustained their burden of proof with respect to purposeful availment by proving voluntariness and foreseeability on the part of Iron Workers. First, HCVM, on behalf of Iron Workers, voluntarily authorized John Doe to be treated at TMH knowing that such services would be charged to Iron Workers. Pursuant to the contract in effect between Plaintiffs and HCVM, HCVM negotiated for Iron Workers the reimbursement to TMH. In addition, Iron Workers repeatedly contacted PSO by telephone and through written correspondence regarding the request for reimbursement. In addition, at no time did HCVM or Iron Workers refuse authorization for medical services and in fact, specifically contacted Plaintiffs so that their members could be treated at TMH.

It was completely foreseeable to HCVM and Iron Workers that one of its members would seek emergency medical treatment at TMH. Its members had been receiving medical care at TMH since 1998. Importantly, the contract in effect between Plaintiffs and Defendants specifically calls for TMH to be reimbursed when an Iron Workers' member seeks such medical treatment. The contract between Plaintiffs and Defendants specifically provides that Iron Workers will pay TMH 79.88% of the charges for the services. However, despite contracting with TMH for the service provided to its member, John Doe, Iron Workers refused to pay TMH for services provided, which caused this dispute.

The facts of this case are similar to the facts in Verri v. State Automobile Mutual Ins. Co., 583 F. Supp. 302 (D.R.I. 1984). In that case, the defendant insurance company moved the Court to dismiss the Complaint for lack of personal jurisdiction. It alleged that it was an Ohio corporation, with its principal place of business in Ohio and that the insured was also a resident of the State of Ohio. In addition, the automobile involved in the accident was registered in Ohio, the company was not registered or licensed to do business in Rhode Island, had no registered

agent for service of process in the State of Rhode Island, had no employees in Rhode Island and maintained no directory listings in Rhode Island. In addition, the accident itself occurred in New Hampshire.

The Court found that it had personal jurisdiction of the defendant. In doing so, the Court went through the analysis in determining personal jurisdiction. In finding that personal jurisdiction attached, the Court found persuasive the fact that the insurance policy agreed to insure losses incurred in all states, and therefore, it assumed an obligation that had an economic impact on those states. In addition, the Court found persuasive the fact that there was an arbitration clause in the policy that indicated that arbitration was allowed in any jurisdiction. It further found that by reason of the policy at issue, the insurance company had clear notice that it was subject to being involved in suits out of state, and therefore, the due process requirements had been satisfied.

Finally, the Court in Verri acknowledged that all of the settlement activities of the claim either took place in or had a substantial connection with the State of Rhode Island. Accordingly, the Court found that it exercised personal jurisdiction over the defendant for the purposes of the case.

Even more compelling to this argument and on all fours with this case is the recent Memorandum and Order of the Honorable Mary Lisi of this District dated April 28, 2005 in the case of Women & Infants' Hospital of Rhode Island vs. Community Health Network of Connecticut, Inc. (C.A. No. 04-535ML). (See Exhibit "D"). The contacts of the Defendant in that case may have arguably been even less compelling than in this matter. In that case, Women & Infants' Hospital of Rhode Island ("W&I") provided emergency medical services to a pregnant woman as a result of her transfer from Middlesex Hospital in Connecticut without

authorization or knowledge of the Defendant. After the patient was admitted for emergency treatment, W&I contacted her insurer and the treatment was authorized by the insurer.

Judge Lisi found that the Court had personal jurisdiction over the Connecticut health insurer as the relatedness inquiry had been satisfied. The Court found that since the Connecticut health insurer's representative provided W&I with authorization and a specific authorization number for treatment of the patient, and the fact that the Plaintiff's claims arose out of the actions undertaken by the hospital in reliance upon the authorization, the relatedness prong of the minimum contacts analysis was satisfied.

The Court further found that since authorization was given, "it should have been plainly evident to CHNC, as a managed care organization, that the authorization would induce W&I to provide medical care to Ms. Doe in anticipation that CHNC would facilitate financial reimbursement for those services." (Exhibit "D," page 6). Accordingly, the Court found that it was foreseeable to the health insurer that it might later be held accountable for the authorization in Rhode Island's courts.

Finally, the Court found that the Plaintiff's interest in obtaining relief and Rhode Island's interest in redressing the economic harm sustained in the state by one of its hospitals support the Court's exercise of jurisdiction following Daynard, supra.

In this case, the factors are even more solidly fulfilled. Iron Clad authorized HCVM to contract with the PSO in order for its members to utilize the medical services provided at TMH. Iron Workers' members utilized TMH from the inception of the contract to the present date. In fact, utilization increased over the years. It specifically contracted with HCVM in order for TMH to be on a provider list for its members. It certainly was foreseeable that its members

would be treated at TMH and that such would induce TMH to seek reimbursement of 79.88% of all charges as a result of treatment to an Iron Workers Fund member.

For the foregoing reasons, the second prong of the tripartite analysis has been satisfied by Plaintiffs.

3. **Reasonableness.**

Because the relatedness and purposeful availment prongs have been satisfied by Plaintiffs, the Court must next weigh the reasonableness of personal jurisdiction by examining the Gestalt factors. The First Circuit has enumerated the Gestalt factors to be used in determining the fairness and reasonableness of asserting personal jurisdiction over a defendant:

1. The defendant's burden of appearing;
2. The forum state's interest in adjudicating the dispute;
3. The plaintiff's interest in obtaining convenient and effective relief;
4. The judicial system's interest in obtaining the most effective resolution of the controversy; and
5. The common interests of all sovereigns in promoting substantive social policies. Nowak, supra at 717 citing United Elec. Workers, supra at 1088.

Plaintiffs have satisfied the Gestalt factors with respect to fairness and reasonableness in asserting personal jurisdiction as detailed below.

a. **The Defendants' Burden of Appearing.**

In assessing the burden of appearing in a foreign jurisdiction, "this court recognizes the fact that defending [oneself] in a foreign jurisdiction almost always presents some measure of inconvenience." Branch Metal Processing, Inc. v. Boston Edison Company, 952 F. Supp. 893 (D.R.I. 1996) quoting Sawtelle, supra at 1395. However, a Plaintiff's choice of forum is traditionally granted some deference. Daynard, supra. at 62. The Plaintiff should be given deference with respect to its choice of forum here. In this case, TMH opened its doors to a patient for emergency, life-saving medical treatment. TMH provided necessary emergency

treatment to the patient which was authorized and agreed to in a contract by Iron Workers, which then refused to pay for the services rendered. In determining burden, Plaintiffs note that the Plaintiffs' witnesses are in Rhode Island. Further, the negotiation of the contract, the activity of Iron Workers, the service provided to John Doe and the breach all took place in Rhode Island. In addition, the reimbursement contract was executed in Rhode Island. Although it may be inconvenient for Defendant to defend itself in Rhode Island, it would be prejudicial, unfair and even more inconvenient to the Plaintiffs to transfer the case to Massachusetts. There is no evidence to indicate that the choice of forum by the Plaintiffs was to "vex, harass, or oppress the defendant." Ticketmaster, supra, at 211. Accordingly, Rhode Island is a more convenient forum and any inconvenience to the Defendants is minimal under the circumstances.[3]

**b. The Forum's Interest In Adjudicating The Dispute.**

With respect to this factor, Rhode Island has a much stronger interest in adjudicating the dispute than Massachusetts. The contract specifically requires Iron Workers to pay TMH for health care services provided to its members. In this particular instance, the State of Rhode Island has great interest in ensuring that one of its non-profit hospitals, which provides charity care, is reimbursed for the services that it provided to a member with insurance. The resources of TMH is compelling since the denial of valuable resources to the hospital will have a dramatic effect on its ability to provide charity care to those who are unable to pay, and most importantly, to its very existence. There is a direct impact on access to medical care of uninsured and/or underinsured patients in Rhode Island if HCVM (or other managed care companies) or Iron Workers does not pay for the services provided to members. The financial viability of TMH is critical to its ability to continue to operate and provide state of the art medical services to all

[3] See also Women & Infants' Hospital of Rhode Island v. Community Health Network of Connecticut, Inc., Memorandum and Order, Exhibit "D."

patients, including those patients that seek medical care from all over Southeastern New England. TMH must be reimbursed for the services it provides so that its very existence as a fundamental cog in the health care delivery system in Rhode Island is not jeopardized.

Defendants should not be allowed to shirk the contractual responsibility to pay TMH for the services provided to John Doe at the cost of patients in the State of Rhode Island. Accordingly, Rhode Island has a much stronger interest in adjudicating this dispute than Massachusetts.

**c. <u>The Plaintiffs' Interest In Obtaining Convenient And Effective Relief</u>.**

Again, this factor has been satisfied since Rhode Island is the most convenient and effective forum in which to obtain relief as a result of the breach by Defendants in the State of Rhode Island.

**d. <u>The Judicial System's Interest In Obtaining The Most Effective Resolution of the Controversy</u>.**

The criteria to consider with respect to this factor are similar to number 2. In this case, Rhode Island's judicial system has a stronger interest in obtaining the most effective resolution of the controversy since TMH is a non-profit entity which provides charity care to uninsured and underinsured patients in the State of Rhode Island. TMH did nothing to cause this dispute. To the contrary, it provided necessary, life-saving emergency medical services to an Iron Workers' member. To cause the non-profit institution to have to litigate the controversy in Massachusetts would be costly, burdensome and onerous. For these reasons, the fourth factor weighs in favor of Plaintiffs.

**e. <u>The Common Interests Of All Sovereigns In Promoting Substantive Social Policies</u>.**

Plaintiffs submit that the interest of both Massachusetts and Rhode Island favors personal jurisdiction over the Defendant in Rhode Island. Providing access for patients to a state of the

art, highly esteemed hospital of high reputation in the Northeast, without regard to their ability to pay, is something that both the Commonwealth of Massachusetts and the State of Rhode Island has an interest in with respect to public policy. Patient access is and should be a strong component of the public policy in both states. It is absolutely foreseeable that Iron Workers members will seek medical treatment at TMH. Such was specifically contemplated in the contract with the Defendants. Both Rhode Island and Massachusetts have an interest in ensuring that TMH provides high quality medical services to any patient that arrives at its doorstep, and that if the patient has insurance, that such services will be paid in order to ensure the ability of TMH to continue to provide high quality health care to its patients, insured, uninsured or underinsured.

Accordingly, Plaintiffs have satisfied the Gestalt factors—the third prong of the tripartite test.

Based upon the analysis set forth above and the evidence presented, Plaintiffs have sustained the burden of proof with respect to personal jurisdiction over Defendant, Iron Workers.

Accordingly, Plaintiffs respectfully request that this Court deny Defendant's Motion to Dismiss the Complaint.

Respectfully submitted,

LIFESPAN PHYSICIANS PROFESSIONAL SERVICE ORGANIZATION and THE MIRIAM HOSPITAL

By Its Attorney,

Linn F. Freedman

Linn F. Freedman (#4778)
NIXON PEABODY LLP
One Citizens Plaza, Suite 500
Providence, Rhode Island 02903
Tel.: (401) 454-1108
Fax: (866) 807-6614

Date: September 2, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2ND day of September, 2005, I caused a true copy of the within Memorandum in Support of Objection to Dismiss to be mailed to the following:

Matthew T. Oliverio, Esq.
Oliverio & Marcaccio, LLP
55 Dorrance Street, Suite 400
Providence, RI 02903

Michael J. Lepizzera, Jr., Esq.
Lepizzera and Leporine
301 Metro Center Blvd., #102
Warwick, RI 02886

Meride Dooris